Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
David S. Rankin (SBN 270326) *dr@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff Mark Heinaman

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| MARK HEINAMAN,<br><br>              Plaintiff,<br><br>vs.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 to 10, inclusive<br><br>              Defendants. | Case No.:<br><br>Action Filed :<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br> - Civil Cover Sheet;<br> - Summons; and<br> - Certification of Interested Parties] |

Case No.:

**JURISDICTION AND VENUE**

1.      Plaintiff Mark Heinaman ("Plaintiff") brings this action to recover benefits and to enforce and clarify his rights under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA section 502(e) and (f), 29 U.S.C. section 1132(e) and (f), and 28 U.S.C. section 1331.

2.      Venue lies in the Central District of California, Southern Division pursuant to ERISA section 502(e)(2), 29 U.S.C. section 1132(e)(2), because Plaintiff resides in this District, some of the breaches alleged occurred in this District and the ERISA-governed plan at issue was administered in part in this District.

**THE PARTIES**

3.      Plaintiff is an individual who is a citizen of the state of California and at relevant times was a resident of Orange County, California, City of San Clemente. Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA section 3(7), 29 U.S.C. section 1002(7), in the employee welfare benefit plan established by his former employer, Heinaman Contract Glazing (the "Plan"), which is at issue in this action.

4.      Defendant Unum Life Insurance Company of America ("Unum"), at all relevant times administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number 91565 002 to

Case No.: 

Heinaman Contract Glazing ("HCG"). That policy and the Plan promised to pay LTD benefits to Plaintiff should he become disabled.

5. The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sue DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment. Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

## FACTUAL BACKGROUND

6. At the time of his disability, Plaintiff worked as Vice President of HCG, and was responsible for directing, administering, and coordinating the activities of HCG in support of policies, goals, and objectives established by the President and the Board of Directors. Plaintiff was also responsible for, among other things, providing leadership for California and Nevada Operations Managers, Senior Project Managers, Superintendents, and Computer-Aided Design operators to facilitate the execution of subcontract work agreements, establishing and enforcing policies and procedures for HCG operations, assuring schedules are maintained and followed, providing monthly updates and billing projections, directing and coordinating accounts and establishing procedures for monitoring outstanding bills, establishing and maintaining contact with stockholders, customers, financial

Case No.:



1    institutions, and the investment community, establishing and maintaining and

2    providing billing projections and various reports to other executives at HCG.

3

4        7.    As part of his duties, Plaintiff was required to concentrate, sit, stand

5    and walk frequently, travel frequently, climb stairs occasionally, and interact with

6    customers, other executives and employees frequently.

7

8        8.    Plaintiff experienced persistent back pain and was diagnosed with

9    cervicalgia for a number of years prior to the date of his disability, and he received

10   multiple treatments and procedures for his pain, including epidural steroid injections

11   and selective nerve root blocks, until his pain gradually increased and became

12   severe.

13

14       9.    On April 16, 2007, while living in Nevada, Plaintiff underwent an MRI

15   of his cervical spine which revealed degenerative changes in his cervical spine at

16   C5-6 including a broad-based disc protrusion herniation measuring 2mm and a

17   broad-based disc protrusion herniation measuring 2mm C6-7 which indents the

18   ventral dural sac with disk bulges slightly toward the left, and there was evidence of

19   cord or root compression at C5-6 and C6-7.

20

21       10.   On March 25, 2009, Plaintiff underwent a cervical discogram of C4-5,

22   C5-6, and C6-7, and the report from his discogram revealed diagnoses for cervical

23   radiculitis, cervical disk degeneration, cervical spondylosis, and chronic pain

24   syndrome, and also noted that the potential risks of his procedure included worse

25   pain.

26

27       11.   On March 26, 2009, Plaintiff treated with Dr. Stephen H. Barkow, a

28   physician specializing in pain management, complaining of severe pain in his neck

-3-



that he rated at 7 out of 10 on the pain scale and which was exacerbated with movement. Dr. Barkow noted obvious deformities of Plaintiff's cervical spine and indicated that Plaintiff would consult with a neurosurgeon.

12.    On April 2, 2009, Plaintiff received a neurosurgical consultation and physical examination from Dr. Sylvain Palmer, a neurosurgeon, who noted that Plaintiff's discogram was positive at C5-6 and C6-7, and was also abnormal at C4-5, and Dr. Palmer recommended Plaintiff undergo a two-level cervical fusion, pending additional pre-surgery evaluations.

13.    On April 20, 2009, shortly after his neurosurgical consultation with Dr. Palmer, Plaintiff was forced to stop working due to his severe back pain.

14.    Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to LTD benefits because he met, and continues to meet, the Plan's operative definition of "disability" and the other conditions necessary to qualify for LTD benefits during the requisite time period. The Plan provides that :

> Totally Disabled means, for the first 30 months, you are rendered unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

15.    The Plan further states that:

After benefits have been paid for 24 months of disability you are totally disabled when you are

- Rendered unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way; and
- Rendered unable to engage with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, physical and mental capacity.

-4-

Case No.:



16.     Prior to undergoing the cervical fusion, Plaintiff submitted his application for long-term disability benefits to Unum, which included an Attending Physician's Statement completed by Dr. Barkow on July 8, 2009, which listed Plaintiff's diagnoses as disc degeneration and cervical radiculitis and indicating that Plaintiff's symptoms cervical, head, and shoulder pain prevented him from being able to work and also indicating that he was totally temporarily disabled.

17.     On June 14, 2009, Plaintiff completed an Employee/Individual Statement indicating that he was depressed due to being unable to work, he was in pain and unable to sit for long periods of time at his computer, and he had to remain horizontal in order isolate his head.

18.     On July 14, 2009, Dr. Palmer performed an anterior cervical discectomy at C5-6 and C6-7, implantation of a ProDisc biomechanical prosthesis at C5-6, and implantation of a Zero-P biomechanical device at C6-7 on Plaintiff.

19.     On September 11, 2009, Plaintiff appeared at Advance Manual Therapy Institute for an initial evaluation for physical therapy with Jody L. Stafford.  Ms. Stafford noted Plaintiff's complaints of neck and mid-back, the fusion to his cervical spine and also noted tenderness at C5-C7, T1-T8, and T10.

20.     Plaintiff followed up with Dr. Barkow on October 6, 2009, reporting he had difficulties obtaining his medication in Nevada and he had to go to the emergency room on September 28, 2009 to obtain more OxyContin.  Plaintiff also reported difficulty sleeping and described his cervical pain as aching, sharp, and shooting.  Dr. Barkow listed Plaintiff's diagnoses as disc degeneration, cervical radiculitis, cervical spondylosis, acute postoperative pain, chronic pain, insomnia, and drug dependence.

Case No.:

21.     On October 29, 2009, Unum conducted a telephone interview with Plaintiff asking when his condition began and what caused him to leave work. Plaintiff explained that he experienced back and neck pain for many years and "saw a whole slew of doctors of every kind from holistic approach to ortho surgeons." Plaintiff then explained that he received numerous steroid injections that did not work and caused him to have pain and stiffness in his shoulders and upper back, and his lumbar spine froze up.  He then explained that after choosing Dr. Palmer as his neurosurgeon, he underwent surgery on July 9, 2009, whereby an artificial disc was implanted and a "dogbone" plate was also inserted on another part of his cervical spine with 4 screws, due to the fact that his insurance company would only pay for one artificial disc even though he needed two.  Plaintiff further explained that he attended physical therapy 3 times per week and was doing aqua therapy, but he could not move his neck like he could previously.  He also mentioned he was taking approximately 30 mg of Oxycodone per day and he could not return to work because his medications make him groggy and he could not talk to employees and clients in his condition.  He further stated that his physicians advised that he could not sit for extended periods of time, work on the computer or lift anything, but he planned on returning to work when released by his physician.

22.     By letter dated November 16, 2009, Unum informed Plaintiff that it approved his claim for LTD benefits effective October 23, 2009.

23.     On January 6, 2010, a Unum vocational consultant conducted an occupational analysis of Plaintiff's position as Vice President of HCG.  The vocational consultant determined Plaintiff's position was most consistent with that of a vice president and general manager of an industrial organization.  The vocational consultant then listed the physical demands of this occupation as light work requiring the exertion of up to 20 pounds of force, frequent sitting, occasional

Case No.:

walking and standing, reaching in any direction, handling, fingering, and frequent keyboarding.

24.    The vocational consultant further determined that Plaintiff's position required him to participate in formulating and developing company policies and develop long-range goals and objectives, direct and coordinate department activities, review and analyze activities, costs, operations, and forecast data to determine progress toward stated goals, confer with other executives and administrative personnel, analyze budgets, serve on department committees, and promote his organization in the industry.

25.    On January 4, 2010, Plaintiff attempted to return to work, and began working approximately 3 days per week for approximately 2 hours per day.

26.    On February 11, 2010, Unum had a vendor conduct a personal visit at Plaintiff's home and prepare a Field & Vendor Services Field Report. In the report, it was noted that Plaintiff suffers from depression and anxiety stemming from not being part of his work environment and from his belief that he appears weak to his employees, and he is receiving treatment for mental problems that have arisen from his osteoporosis and degenerative disc disease.

27.    The Field & Vendor Services Field Report noted that during the interview, Plaintiff requested to lie on the couch and propped his neck up to relieve the pain and pressure in his back and neck, and he never remained in one position for more than 15 minutes and he would also get up and walk around every 15 minutes. Plaintiff stated that he went into the office about two hours at a time for 3 to 4 days per week to speak with employees, visit the production department, and to keep informed of changes at the company. He also stated that his job requirements

Case No.:

1  of sitting for extended period of time, standing, and traveling were very difficult for

2  him. Plaintiff indicated he sought treatment with his psychiatrist, Dr. Arsalan

3  Darmal, once a month but all appointments are completed via conference call since

4  Dr. Darmal is located in Newport Beach, California, and Plaintiff was living in

5  Nevada at the time.

6

7  28.    The Field & Vendor Services Field Report listed the medications

8  Plaintiff was taking as Cymbalta 60mg. (used to treat depression), Budeprion

9  150mg. (used to treat depression), Trazadone 100mg. (sleep aid), Gabapentin 300

10 mg. (taken 8 times per day for pain and causes drowsiness and dizziness), Clonidine

11 0.1mg. (taken as a sleep aid), Meloxicam 15mg. (anti-inflammatory that causes

12 drowsiness and dizziness), Oxycodone 20mg. ER (taken once every 8 hours for pain

13 and causes drowsiness and dizziness), Oxycodone 15mg. ER (also taken once every

14 8 hours and causes drowsiness and dizziness), and Metroprolol Tartate 50mg. (taken

15 twice a day for high blood pressure).

16

17 29.    On March 2, 2010, an agent with Unum, called Plaintiff to request

18 information regarding his inability to work full-time. Plaintiff advised that there

19 was a psychological component to his fatigue as he is psychologically affected by

20 not being able to run the company due to his condition. He also stated that he was

21 affected because his 70 year old father wanted to retire, but he was unable to take

22 over the company due to his condition.

23

24 30.    Unum hired HUB Enterprises to conduct surveillance on Plaintiff from

25 March 3, 2010 to March 5, 2010. Plaintiff was observed attending his physical

26 therapy sessions and entering a HCG building, however nothing disproving

27 Plaintiff's disability was observed.

28

Case No.:



31.     On March 8, 2010, Plaintiff contacted Unum and advised that Dr. Daniel Batlan, his pain management doctor at the time, and Dr. Palmer would not complete the Attending Physician Statement requested by Unum as it is their general practice not to complete these types of forms due to time constraints and liability concerns.  Plaintiff's doctors suggested he undergo a Functional Capacity Evaluation performed by a specialist at a medical facility called Healthsouth, and he was having difficulty having the Attending Physician Statement Completed by one of his doctors.

32.     On April 7, 2010, Unum representatives had a "roundtable" to discuss Plaintiff's claim for disability benefits, and it was noted that Unum's orthopedic consultant advised it was too early after surgery to have an IME conducted, as they would need to wait until a year after surgery before a valid IME could be performed. Unum noted that Plaintiff's doctors did not respond to their requests for updated restrictions and limitations, so they decided to continue paying benefits and update Plaintiff's medical records and contact him regarding work and at-home activities in order to reassess his claim.

33.     On April 28, 2010, Plaintiff's physical therapist, Jodi Stafford completed an Attending Physician's Statement listing Plaintiff's primary diagnoses as neck pain and mid back pain following a cervical spine fusion.  Ms. Stafford listed Plaintiff's functional capacity as being able to occasionally climb and reach above shoulder level, occasionally stoop without weight, occasionally lift up to 10 pounds, and never push or pull more than 10 pounds.  Ms. Stafford also indicated that Plaintiff was restricted from prolonged overhead lifting, extreme head motion involving rotation or backwards bending, prolonged driving or travel, and he could not lift greater than 10 pounds or lift any weight overhead, and he could no sit or

Case No.:

1  stand for prolonged periods greater than 30 minutes without stretching due to

2  muscle imbalances.

3

4      34.    On July 15, 2010, a Unum representative conducted a telephonic

5  ongoing claim management conference with Plaintiff.  Plaintiff stated that he

6  attempted to work whenever he could, but he could not sit for very long and had to

7  get up every 30 minutes to stretch, he was not able to attend certain meetings that

8  required prolonged sitting as it was disruptive to get up frequently during the

9  meetings, and he also noted that he attended physical therapy 3 times per week for 2

10 hours at a time.  Plaintiff further stated that his biggest problem is his depression due

11 to the fact that he could not contribute to HCG like he did before.

12

13     35.    When the Unum representative asked when Plaintiff would be able to

14 return to full-time work, he stated he was unsure and it is primarily the sitting and

15 required concentration that prevents him from returning.  Plaintiff also indicated that

16 his biggest problem was having one of his doctors complete the Attending Physician

17 Statement, and he attempted to go to Healthsouth as he was directed by Dr. Darmal,

18 but he was told that they would not perform an evaluation and complete the

19 Attending Physician Statement.

20

21     36.    On July 26, 2010, Plaintiff had X-rays taken of his cervical spine which

22 revealed stable surgical changes and surgical hardware at C5/C6 and C6/C7 with

23 degenerative changes of the lower cervical spine.

24

25     37.    On September 9, 2010, Unum's Clinical Consultant, Jessie Anderson,

26 RN, conducted a review of Plaintiff's medical records to determine his restrictions

27 and limitations.  Nurse Anderson indicated that it was unclear if the restrictions and

28 limitations provided by Plaintiff's physical therapist were reasonable and supported,

Case No.:



1   and she stated that further clinical information was needed for further assessment,

2   including Plaintiff's psychiatric records and pain management records.

3

4       38.    On September 20, 2010, Plaintiff completed an Employee Information

5   Form indicating that the best position for his back and neck is laying down

6   horizontally and he had to get up every 30 minutes to relieve pain in his neck and

7   back.  He also listed his medications as MS Contin, Oxycodone, Neurontin,

8   Trazadone, Cymbalta, Fenoglide, Androderm, Tropol, Clonodine, and Wellbutrin.

9

10      39.    On January 17, 2011, Plaintiff was forced to stop working due to the

11  fact that he was unable to perform his duties and give proper direction to his

12  employees, his medication made him foggy and fatigued, and his back and neck

13  pain prevented him from standing, walking, and sitting for long periods of time as

14  required by his job.

15

16      40.    On February 16, 2011, Jodi Stafford responded to a letter from Unum

17  requesting her assessment of Plaintiff's functional capabilities, and she indicated

18  that Plaintiff could only lift or carry up to 10 pounds, he could occasionally reach in

19  any direction, and he could perform minimal overhead lifting.

20

21      41.    On February 25, 2011, Plaintiff completed an employee questionnaire

22  indicating that he is not able to sit or stand in one position for a long period of time,

23  he is still foggy and forgetful, and he still suffered from depression.  Plaintiff also

24  noted he was having difficulty getting his doctors to complete the Attending

25  Physician Statements as they were concerned with their liability.

26

27      42.    On March 11, 2011, Dr. Brian E. Chavez, Plaintiff's endocrinologist,

28  completed an Attending Physician Statement listing Plaintiff's limitations as lifting

-11-



1    no greater than 10 pounds, no overhead weight lifting, no prolonged sitting or

2    sedentary positions greater than 30 minutes without stretching, and no extreme head

3    motions involving rotation or backwards motion.

4

5        43.    On May 24, 2011, Plaintiff applied for Social Security Disability

6    Benefits and was subsequently denied benefits by the Social Security

7    Administration.

8

9        44.    On May 25, 2011, Unum conducted an Ongoing Claims Management

10    telephone call with Plaintiff, and he stated that his pain and tiredness kept him off

11    work, he could not sit for long periods, he had to lay horizontally, he could sit for

12    approximately 15 minutes before he started to squirm, and he could only stand for

13    approximately 15 to 20 minutes.  Plaintiff went on to state that he could not

14    represent the company in a professional manner, his physical condition caused his

15    depression, his self-esteem has been affected, it was difficult for him to sleep and

16    sleeping required medication, he rated his pain as an 8 out of 10 on the pain scale,

17    and stated he could not make it through the entire day.

18

19        45.    On June 7, 2011, Unum's consulting physician, Dr. Denise D.

20    Williamson, an orthopedic surgeon, conducted a Doctoral Consultation regarding

21    Plaintiff's restrictions and limitations.  ***Dr. Williamson determined that the***

22    ***available medical records supported the restrictions and limitations provided by***

23    ***Dr. Chavez and they were likely permanent.***  Dr. Williamson noted that Plaintiff

24    had consistent and persistent complaints, consistent visits with providers, consistent

25    findings on physical exam and imaging, pain in his cervical, thoracic, and lumbar

26    spine, a significant pain medication regimen, refilled monthly on a consistent basis,

27    extensive treatment including narcotics, injections, physical therapy and frequent

28    massage therapy which all supported the restrictions and limitations listed by Dr.



Chavez. Dr. Williamson concluded that there is no evidence contained in the file, clinical or non-clinical, which supports Plaintiff's ability to perform "above" the stated restrictions and limitations from his doctors.

46.     By letter dated June 21, 2011, Unum notified Plaintiff that as of November 18, 2011, his claim would be evaluated under a definition of disability requiring an inability to perform any occupation for which he is reasonably qualified by way of training, education, and experience.

47.     On August 31, 2011, Unum conducted a vocational assessment in order to determine if alternate gainful occupations exist within Plaintiff's restrictions and limitations. The conclusion was that Plaintiff would not have alternative gainful occupations that he could reasonably be expected to perform satisfactorily due to the very focal skill set he had for construction (glazing) management since he lacked suitable executive experience to translate into another industry.

48.     On December 7, 2011, Unum conducted an annual review of Plaintiff's claim and determined that there was no improvement in his condition that would allow him to gain functional capacity and it was appropriate to continue paying his claim.

49.     On January 13, 2012, Plaintiff was examined by Dr. Khemka, a pain management physician, complaining of upper back and neck pain that he described as continuous and sharp and rated at an 8 out of 10 on the pain scale. Dr. Khemka noted that Plaintiff's current function level was poor and there was tenderness in Plaintiff's thoracic spine and cervical spine with paraspinous muscle spasms and bilateral facet loading signs. Dr. Khemka advised Plaintiff to continue taking his medications as prescribed and to do his home exercises. Plaintiff's pain medication



regimen was listed as: 1 MS Contin 30mg. every 6 hours as needed for pain, 1 Soma 350 tablet every 12 hours, and 1 Oxycodone 30mg. tablet every 6 hours as needed for pain.

50.     On February 10, 2012, Plaintiff returned to Dr. Khemka complaining of pain in his upper shoulders and back with new tingling in three fingers on his left hand, and shooting pain in the neck to the shoulder on the left side.  Dr. Khemka listed Plaintiff's diagnoses as Cervical Spondylosis WO Myelopathy (ICD Code 721.0), Throacic Spondylosis WO Myelopathy (ICD Code 721.2), UNS Myalgia/Myositis (ICD Code 729.1), Pain in the Thoracic Spine (ICD Code 724.1), and Cervicalgia (ICD Code 723.1).  Dr. Khemka recommended an IV-infusion, thoracic paraspinal trigger point injections and lumbar medial branch blocks and advised Plaintiff to continue with his medication regimen.

51.     On January 16, 2013, Dr. Khemka noted that Plaintiff's pain began to become more severe and was described as sharp, aching, knife-like and constant with shooting and numbness sensations, and he rated his pain as 8 out of 10 on the pain scale.  Dr. Khemka changed Plaintiff's prescription from Oxycodone 15mg. to Opana 10mg., he prescribed MSIR 30 mg., and he also began administering thoracic radio frequency ablations and recommended that Plaintiff began physical therapy treatment again.

52.     On February 10, 2012, Plaintiff returned to Dr. Khemka complaining of continuous sharp shooting pain in his shoulders and upper back with tingling in his fingers, and Dr. Khemka's physical examination revealed spine tenderness with paraspinous muscle spasms, bilateral facet loading signs, decreased range of motion in the thoracic spine, and diffuse muscle tenderness to the cervical, lumbar, and thoracic paraspinal muscles.



53.    On January 11, 2013, Dr. Darmal completed an Attending Physician's Statement listing Plaintiff's primary diagnosis as major depression and his secondary diagnoses as General Anxiety and Attention Deficit Disorder, and he further noted that he suffered from feelings of hopelessness, helplessness, decreased energy and motivation, difficulty sleeping, pain, and difficulty with memory and focus.  Dr. Darmal noted that his diagnosis was supported through diagnostic interviews, mental status examinations, brain imaging, and a Beck Depression Inventory.  Dr. Darmal listed Plaintiff's behavioral health restrictions and limitations as difficulty with memory, focus and complex tasks, noting that Plaintiff could not perform multi-tasking activities.  Dr. Darmal concluded by stating that Plaintiff was treating with individual psychotherapy and medication management, psycho-education, and cognitive behavior therapy.

54.    On April 26, 2013, Plaintiff attended an administrative reconsideration and a hearing before Judge Norman L. Bennett, an Administrative Law Judge, after his application for Social Security Disability benefits was denied, and he was represented by a non-attorney representative appointed at Unum's request and indeed insistence.  Judge Bennett denied Plaintiff's request for reconsideration and not only improperly questioned Plaintiff's credibility based not on dishonest testimony or evidence, but relied on blatantly irrelevant and false information.  His findings are hopelessly inconsistent, determining that Plaintiff's impairment was "severe" because it "significantly limited [Plaintiff's] ability to perform basic work activities" yet he determined Plaintiff was not disabled based on a highly dubious analysis.  Judge Bennett also improperly rejected the opinion of Plaintiff's psychiatrist due to his proper reliance upon Plaintiff's subjective complaints.

55.    For example, Judge Bennett demanded objective evidence of Plaintiff's subjective complaints and he improperly rejected the opinion of Plaintiff's



1    psychiatrist due to his proper reliance upon Plaintiff's subjective complaints. Judge

2    Bennett also improperly questioned Plaintiff's credibility based upon his travels to

3    California for treatment and to Mexico for visits to his wife's family, but Judge

4    Bennett did not appear to be aware of the purpose for Plaintiff's travel to California

5    for medical treatment and Mexico to visit family as he insinuated that Plaintiff was

6    traveling for vacation. He also did not consider that Plaintiff, when he traveled by

7    automobile to California, often stopped to get out of the car to take breaks to rest

8    and stretch.

9

10       56.    Judge Bennet also questioned Plaintiff's credibility related to his

11   restrictions and limitations by noting that Plaintiff disclosed he spent several weeks

12   watching his children, one of which is special needs in California in August and

13   September 2011. Judge Bennett demonstrated his lack of information by insinuating

14   that Plaintiff's children were young and in need of constant special supervision. At

15   the time, Plaintiff was with his wife while his children, who were teenagers in high

16   school, were staying with him, and neither of them required special supervision or

17   care and to the extent they needed attention, his wife took care of these duties.

18   Judge Bennett also wrongly believed that Plaintiff continued to receive substantial

19   amounts of money from HCG after he left work at HCG. Judge Bennett believed

20   Plaintiff was in a significantly comfortable financial situation indicating he

21   maintained a 30% ownership in the company, despite the fact that Plaintiff has not

22   received any income from HCG since 2011. Overall, Judge Bennett's decision

23   appears to purposefully undermine Plaintiff's claim for SSDI due to a belief that

24   Plaintiff was not in actual financial need when the contrary is true. Indeed, Plaintiff

25   and his wife were recently forced to sell their home because they could no longer

26   afford it.

27

28

Case No.:

57.     Plaintiff began treating with Dr. Andres Betts, a pain management physician, on or around September 12, 2013.  In his initial visit, Dr. Betts noted that Plaintiff had cervical spine pain and increased symptoms which were unresponsive to his usual narcotic pain medications.  Dr. Betts began a trial of cervical epidural steroid injections.

58.     On November 22, 2013, Unum conducted another annual review of Mr. Plaintiff's claim for disability benefits.  Plaintiff's diagnoses were listed as Cervical Spondylosis w/o Myelopathy, Throacic Spondylosis w/o myelopathy, degeneration of cervical/thoracic discs, Hypothyroidism, Depression, Anxiety, and Attention Deficit Disorder.  Unum determined that based upon the medical records in Plaintiff's file, it was unlikely he would be able to return to work in a gainful capacity due to back and neck pain.  Unum further determined that Plaintiff had a very high gainful wage, and a return to work on a consistent or sustained basis would be unlikely, and Unum decided to continue paying Plaintiff the long-term disability benefits to which he was entitled.

59.     On August 19, 2014, Dr. Betts noted that Plaintiff continued to experience chronic cervical pain and noted his pain medication regimen as MS Contin 30mg. and Oxycodone 15mg.

60.     After a visit on September 17, 2014, Dr. Betts noted that Plaintiff's previous cervical epidural injection provided relief, but he has since developed recent increasing pain.

61.     On October 24, 2014, Plaintiff treated with Dr. Darmal who noted that he was still struggling with pain control despite having an epidural block and taking Oxycodone, and when his pain became worse, his depression became worse as well.



62.    On April 3, 2015, Plaintiff treated with Dr. Darmal noting that he was stressed due to issues with his daughter.  Dr. Darmal noted that Plaintiff was stable but he still needed help with his focus and his Attention Deficit Disorder.

63.    On May 19, 2015, Plaintiff was examined by Dr. Betts who noted that he was experiencing increased cervical pain which he classified as chronic cervical pain, and Dr. Betts listed Plaintiff's medication as MS Contin 30mg, Oxycodone, and Soma.

64.    On May 20, 2015 Plaintiff treated with Dr. Betts who administered a repeat cervical epidural steroid injection and noted that Plaintiff had persistent cervical spine pain consistent with post-laminectomy syndrome and he had increased cervical pain despite his opiate medication.

65.    On August 6, 2015, Dr. Darmal completed an Attending Physician Statement listing Plaintiff's diagnoses as Major Depression, General Anxiety Disorder, and Attention Deficit Disorder, and also reported his symptoms as anhedonia, decreased energy, lack of sleep due to difficulty with pain, difficulty with memory, and hopelessness.  Dr. Darmal stated that his diagnoses were supported by mental status examinations, diagnostic interviews, Beck Depression Inventory, and brain imaging.  Dr. Darmal also noted that Plaintiff suffered from neck pain and back pain, and he listed Plaintiff's physical restrictions as avoiding heavy lifting.  Plaintiff's behavioral health restrictions were listed as poor memory, difficulty with focus and concentration and complex tasks, an inability to multi-task, and brain fog.  Dr. Darmal's treatment plan was listed as individual psychotherapy with medication management, psycho-education, and cognitive behavior therapy to improve coping mechanisms.

Case No.:



66.    On September 2, 2015, Dr. Betts examined Plaintiff and noted that he experienced continued cervical pain and continued his medication regimen.

67.    On or around December, 2015, Unum hired GAS Compliance and Investigations ("GAS"), to obtain additional information regarding Plaintiff's current physicians, medications, daily activities, restrictions and limitations, and future plans.  On December 7, 2015, a GAS investigator went to Plaintiff's home to conduct an interview.   The investigator noted that Plaintiff's recall of events appeared in tact, but he "frequently seemed to get stuck searching for details like names and dates," and his speech was somewhat slurred.

68.    The GAS investigator also noted that Plaintiff changed position frequently while sitting and made numerous small adjustments to the recliner he was sitting in, and was not seen performing any task or making movements that were inconsistent with his reported injuries.

69.    The investigator's notes, prepared after a discussion with Plaintiff, reveal that after Plaintiff's surgery and recovery, he was still in significant pain and experienced numbness in his fingers, however he attempted to return to work but found it extremely difficult to concentrate and was in and out of work frequently. Plaintiff finally reached the point where he had to acknowledge that he was no longer able to be productive as he repeatedly missed meetings and was no longer contributing anything to the company.  Plaintiff further explained that while he struggled at a management task for a full workday without succeeding, another person did the same task in ten minutes without difficulty and he came to believe it was not fair to continue working as he was no longer productive.  Plaintiff was unable to do any significant physical activity without being extremely careful to



avoid increasing his pain, and his medication has had a deleterious effect on his ability to think clearly.

70.    On December 17, 2015, Plaintiff underwent an initial consultation with Dr. Danielle Greer, an internal medicine physician.  Dr. Greer noted that Plaintiff has chronic pain related to post-laminectomy syndrome and he is taking MS Contin, Oxycodone, and he also requires IV Dilaudid for pain.  Dr. Greer noted that Plaintiff appeared slightly sedated, and diagnosed him with post-laminectomy syndrome of the cervical spine and he has a history of pancreatitis, hypothyroidism, and hypertension.

71.    On December 22, 2015, Plaintiff treated with Dr. Betts who noted that Plaintiff was recently hospitalized for pancreatitis and he was taking Dilaudid in addition to his usual pain medications of Oxycodone and Soma.  Dr. Betts listed Plaintiff's diagnoses as chronic post-laminectomy syndrome and pancreatitis.

72.    On January 7, 2016, Unum conducted another vocational review, and reviewer agreed that Plaintiff's occupation was most consistent with that of Vice President/General Manager Industrial Organization and performed within a light exertion level, which included mental demands consisting of understanding and memory, sustained concentration and persistence, peer and public interaction, adaptation to change, and independent planning.

73.    On January 21, 2016, Samantha Stoddard of Unum called Dr. Betts' office advising that Dr. Betts had not indicated if he was giving Plaintiff any restrictions and limitations.  Dr. Betts advised that he would not comment on disability or restrictions and limitations for Plaintiff.

Case No.:



74.    On January 25, 2016, Diane Mace, a senior claims consultant without any noted medical training, conducted a Clinical Review of Plaintiff's file for Unum.  Ms. Mace claimed that Plaintiff's reports of ongoing pain after surgery were "out of proportion to findings."  However, in reaching this unfounded conclusion Ms. Mace appears to ignore the fact that Plaintiff was diagnosed with post-laminectomy syndrome, which is characterized as chronic back pain that occurs after back surgery and is contributed to by conditions such as depression, anxiety, and spinal muscular deconditioning.

75.    Ms. Mace further claimed, without explanation, that Plaintiff's travel to Mexico was inconsistent with his reported limitations and she also attempted to downplay Plaintiff's consistent reports of medication side-effects by stating that despite the fact that he was noted to have slurred speech during his interview with GAS and despite the fact that he also stated that his medication affected his ability to think clearly, there was no documentation of significant side-effects in his pain management notes.  Ms. Mace ignored that slurred speech and inability to think clearly are typical side-effects from strong pain medications such as OxyContin and Oxycodone.  While such side-effects may not have been noted in their daily reports, the side-effects would most certainly affect one's ability to act as Vice President of a multi-million dollar company like HCG.  Ms. Mace improperly concluded her assessment by rendering her non-medical opinion that the available medical information did not clearly support an inability to perform activities that include frequent sitting and occasional exertion of up to 20 pounds, nor did she find support for impairment related to a behavioral health condition.

76.    On February 9, 2016, Unum sent a letter to Dr. Darmal asking if Plaintiff was able to maintain understanding and memory, sustained concentration and persistence, peer and public interaction, adaptation to change, and independent



planning, occasional exertion of up to 20 pounds, frequent sitting and keyboarding, and occasional standing, walking, reaching, handling, and fingering on a full-time basis.

77.    On February 26, 2016, Dr. Darmal responded to Unum's letter stating that Plaintiff is not able to perform the listed occupational demands on a full-time basis, and he elaborated that Plaintiff still struggles with focus and concentration and the medications he is on are minimally effective, he is forgetful and struggles with complex tasks, he continues to suffer from back pain and muscle spasms.

78.    On March 4, 2016, Plaintiff visited with Dr. Betts, reporting that his pain and stress were increasing, and Dr. Betts listed Plaintiff's pain medications as MS Contin 30mg., Oxycodone 15mg., and Soma 350mg.

79.    On March 16, 2016 Unum hired Dr. Daniel Krell to conduct a doctoral review of Plaintiff's medical records.  After a cursory review of Plaintiff's records, Dr. Krell simply determined that Plaintiff's symptoms and conditions do not rise to a level that would preclude sustained, full-time performance of his duties.

80.    Immediately after mentioning Plaintiff's post-laminectomy syndrome diagnosis, Dr. Krell concluded that there was no evidence that surgical intervention was unsuccessful, despite the fact that post-laminectomy syndrome often occurs after a successful spinal surgery.  Dr. Krell completely ignored Plaintiff's well-documented reports of chronic severe pain which require him to constantly take numerous opioid pain medications, and, contrary to the terms of the Policy, Dr. Krell insisted that Plaintiff's subjective pain complaints be objectively verified before he would agree that he is disabled.  Dr. Krell also failed to reconcile his opinion with that of Dr. Williamson, who was also hired by Unum, and on June 7,

-22-



1  2011 stated that Plaintiff's restrictions and limitations as set forth by his physical

2  therapist and endocrinologist are supported and likely permanent.

3

4       81.    Dr. Krell concluded his report by stating that there are no documented

5  findings of a physical condition that would preclude sustained, full-time

6  performance of occasional exertion of up to 20 pounds, frequent sitting and

7  keyboarding, occasional standing, walking, reaching, handling, and fingering,

8  understanding and memory, sustained concentration and persistence, peer and public

9  interaction, adaptation to change and independent planning.  Dr. Krell failed to note

10 any improvement in Plaintiff's condition that would suddenly allow him to capably

11 perform these tasks.  Additionally, while Dr. Krell mentioned that Dr. Darmal is

12 "opining outside of his field of expertise" regarding Plaintiff's back pain and muscle

13 spasms, he failed to provide any support for his disagreement with Dr. Darmal on

14 Plaintiff's cognitive and mental functioning capabilities, an area that certainly was

15 within Dr. Darmal's field of expertise.

16

17      82.    On March 17, 2016, Plaintiff began psychotherapy sessions with

18 psychologist Dr. Jennifer L. O'Connor, and her records indicate that Plaintiff attends

19 treatment four times per month and listed the diagnoses for which he receives

20 treatment as Major Depressive Disorder (ICD Code F33.2), Generalized Anxiety

21 Disorder (ICD Code F41.1), and Opiate Dependence (ICD Code F11.20).  Dr.

22 O'Connor listed Plaintiff's presenting symptoms as daily stress, anxiety, and worry

23 which affects his daily functioning, chronic muscle tension/pain, sleep disruption,

24 feeling stressed and on edge, irritability, and inability to focus.  Dr. O'Connor noted

25 that Plaintiff appears to be open and honest, genuinely willing to change and

26 improve his coping methods, and her records consistently indicate that Plaintiff

27 reports frustration stemming from his chronic pain.

28

Case No.:

83.     In a Summary of Treatment for the month of March 2016, Dr. O'Connor notes that Plaintiff has ongoing physical pain as well as muscle tension and overall back pain as well as ongoing difficulty focusing and difficulty falling asleep.

84.     In a Summary of Treatment for the month of April 2016, Dr. O'Connor noted that Plaintiff had a flair up of severe back pain, he is unable to complete physical tasks at home, and he has feelings of frustration and hopelessness about his ongoing pain.

85.     On April 6, 2016, Unum hired Dr. Jana Zimmerman to conduct a doctoral review of Plaintiff's psychiatric records.  Dr. Zimmerman concluded that psychological impairment was only reasonably supported during Plaintiff's inpatient admissions even though his records for such admissions are not available.  Dr. Zimmerman relied on the fact that Plaintiff's pain management physicians failed to document any significant medication side-effects to support her conclusion that there were no behavioral health impairments.

86.     In order to downplay the fact that Plaintiff consistently reported to Dr. Darmal and Unum representatives that he was foggy from medication side-effects, and the fact that Dr. Darmal noted that Plaintiff had difficulty focusing, concentrating, he is forgetful and he struggles with complex tasks and could not multi-task (required capabilities in his occupation as Vice President), Dr. Zimmerman noted that sessions with Dr. Darmal were rarely in person and claims that this sort of activity level did not support behavioral health impairment.  Dr. Zimmerman also focused on the determinations of the Administrative Law Judge in Plaintiff's Social Security appeal, determining that Plaintiff had mild limitations in his ability to perform activities of daily living and had mild to moderate limitations

1  in social functioning, seemingly unaware that these determinations have little to do

2  with Plaintiff's ability to perform as Vice President of HCG.

3

4       87.    On April 13, 2016, Unum's Designated Medical Officer, Nurse Pamela

5  McMillian, prepared an opinion regarding the restrictions and limitations set for

6  Plaintiff by his treating physicians.  Nurse McMillian simply stated that there are no

7  documented findings of a physical condition that would preclude sustained, full-

8  time performance of occasional exertion of up to 20 pounds, frequent sitting and

9  keyboarding, occasional standing, walking, reaching, handling, and fingering,

10  understanding and memory, sustained concentration and persistence, peer and public

11  interaction, adaptation to change and independent planning.  Nurse McMillian failed

12  to provide any support for her biased determination and she also failed to provide

13  any insight as to how she reached this conclusion.  Given the complete lack of

14  support given by Nurse McMillian and the superfluous nature of her commentary in

15  light of the review conducted by Dr. Krell, it is unclear why Unum would rely upon

16  her unqualified opinion over those of Plaintiff's own treating physicians.

17

18       88.    On May 3, 2016, Dr. Zimmerman contacted Dr. Darmal to discuss

19  Plaintiff's file evidence with him.  Dr. Zimmerman noted that Dr. Darmal did not

20  change his opinion that Plaintiff had attention and concentration complaints from

21  Attention Deficit Disorder.  Dr. Darmal stated that Plaintiff's physicians are aware

22  of his attention and concentration difficulties and Plaintiff can only work in jobs that

23  do not require attention or concentration or related cognitive abilities as cited in his

24  original opinion.  On May 12, 2016, Dr. Zimmerman prepared an Addendum to her

25  report stating that Dr. Darmal's explanation of his support for the restrictions and

26  limitations he listed for Plaintiff.  Dr. Zimmerman prepared a Designated Medical

27  Officer Opinion on May 19, 2016 concluding that she believes Dr. Darmal's opinion

28  is not well supported, falsely claiming that all of his office visit notes indicate



euthymic mood and do not reflect that Plaintiff was complaining of problems with memory, focus or concentration.  It is unclear what office visit notes Dr. Zimmerman was reviewing as *Dr. Darmal's visit notes consistently notate issues with Plaintiff's memory, focus, concentration, and often describe him as "foggy headed."*

89.    *After paying Plaintiff LTD benefits for over 6 years*, Unum advised Plaintiff that it would no longer continue payment of his LTD benefits and it denied his claim by letter dated May 20, 2016.  Unum determined that Plaintiff is not precluded from performing the substantial and material acts of his usual occupation. Unum relied upon the flawed and biased conclusions of its reviewing physicians and required objective evidence of Plaintiff's subjective complaints in order to deny his claim.  Unum concluded that there are no physical examinations or findings to explain Plaintiff's back pain and muscle spasms, and also determined that there is not any support for ongoing behavioral health impairment.

90.    Unum concluded that Plaintiff is not precluded from performing the substantial and material acts of his usual occupation on a full-time basis from a physical or psychiatric standpoint and he therefore no longer meets the policy's definition of disability.

91.    Unum's placement of greater weight upon the opinions of two paid medical reviewers over the conclusions of Plaintiff's treating physicians is improper for several reasons.  First, the opinions were based solely on a "paper review" of Plaintiff's medical records, not an actual examination of Plaintiff.  Unum not only failed to exercise its right to have Plaintiff examined by an outside physician, its reviewing physicians failed to contact Plaintiff.  Second, these reviewers downplayed the findings of Plaintiff's treating physicians regarding his functional



1    limitations so as to reach a finding that he was not disabled.  For instance, Dr. Krell

2    ignored Plaintiff's diagnosis of post-laminectomy syndrome and simply concluded

3    that there is no objective evidence to support Plaintiff's severe and debilitating pain.

4    Dr. Krell also failed to reconcile his opinion with that of Unum's previous reviewing

5    physician who determined Plaintiff's symptoms were disabling and likely

6    permanent.

7

8        92.    Dr. Betts prepared a letter dated August 24, 2016, certifying Plaintiff's

9    disability.  Dr. Betts noted that despite conservative management with pain

10   medications, physical therapy, acupuncture, and despite his successful anterior

11   cervical fusion, Plaintiff continues to suffer from chronic debilitating cervical spine

12   pain and he is diagnosed with chronic cervical pain from post-laminectomy

13   syndrome, which is characterized by chronic pain that occurs even after a successful

14   cervical spine surgery.  Dr. Betts noted that Plaintiff requires high dose oral pain

15   medication in the form of extended release Morphine, Oxycodone and Soma for

16   management of his symptoms combined with intermittent fluoroscopically guided

17   cervical epidural steroid injections.

18

19       93.    In his letter, Dr. Betts explained that Plaintiff's diagnosis of post-

20   laminectomy syndrome is supported by his limited cervical range of motion causing

21   pain with flexion and extension, right and left lateral rotation, and right and left

22   lateral bending and he has tenderness over the right and left cervical facet joints and

23   his obvious cervical incision is tender to palpation.  *Dr. Betts noted that Plaintiff's*

24   *pain is severe and results in significant functional impairment in terms of his*

25   *activities of daily living and despite experiencing temporary improvement in pain*

26   *control after receiving epidural steroid injections, Plaintiff's improvement was*

27   *never to a degree that would allow him to return to work full-time.*

28



94.     Dr. Betts' letter also noted he continues to treat Plaintiff's chronic pain symptoms with high dose opiate pain medication including MS Contin, Oxycodone, and Soma which have common side-effects including drowsiness, inability to focus or concentrate, slurred speech, and memory difficulties, all of which Plaintiff consistently reported experiencing.

95.     Dr. Betts concluded his letter noting that Plaintiff is unable to work full-time in his prior occupation as Vice President of HCG as his medication side-effects render him unable to concentrate or properly interact with clients and his employees, and his pain increases to unbearable levels with prolonged sitting and standing, repetitive tasks including typing or working at computer consoles, driving, climbing stairs, and walking.  He also explained that Plaintiff is prohibited from lifting or carrying anything weighing more than 10 lbs., or lifting any amount of weight overhead, he could not sit or stand for greater than 30 minutes without stretching, and he could not perform any extreme head motions due to his limited range of motion as observed on physical examination.  Dr. Betts explained that Plaintiff's conditions will most likely continue for an indefinite period and it is reasonable to conclude, based upon his complaints and history of his condition since his surgery, that he is unable to perform any work on a full-time basis in his prior occupation since the date of the onset of his symptoms and his post-surgical condition.

96.     Dr. Darmal prepared a comprehensive letter dated August 20, 2016, addressing the review prepared by Dr. Zimmerman.  Dr. Darmal explained that Plaintiff first visited his clinic on December 3, 2008 noting he experienced difficulties with memory, focus, concentration, assertiveness and holding others accountable.  In his symptom checklist, Plaintiff indicated he experienced feelings of a depressed mood, anxiety, sadness and hopelessness and he experienced a

1   decreased interest in things that are usually fun, his energy was low, he got more

2   tired than he used to, he experienced sleep difficulties including sleep apnea,

3   insomnia, and he had difficulties getting up in the mornings and experienced

4   disrupted sleep.  Dr. Darmal noted that Plaintiff's performance on Connor's CPT

5   dated December 3, 2008 was very poor and his average response time was unusually

6   slow and he frequently neglected to respond to letters which indicates

7   inattentiveness, and he made a large number of omission and commission errors also

8   indicating inattentiveness.  Dr Darmal further explained that Plaintiff's scans

9   showed evidence of marked decrease activity bilaterally of the inferior orbital

10  prefrontal cortex and bilateral temporal lobes which was worse on concentration,

11  and the findings were suggestive of past history of brain trauma.

12

13      97.    In his letter, Dr. Darmal stated that the review of records by Jana

14  Zimmerman was selective, incomplete and inaccurate and it appears that her review

15  of the records were for the purposes of minimizing Plaintiff's medical, physical and

16  cognitive complaints and to deny his benefits.  As an example, Dr. Darmal noted

17  that Dr. Zimmerman made a false statement that Plaintiff's diagnosis of ADD was

18  added without documented corresponding neurobehavioral history or cognitive

19  symptoms from ADD, since Plaintiff's Connor's CPT performance supported his

20  diagnosis.  Dr. Darmal also criticized Dr. Zimmerman's claim that he was unaware

21  of Plaintiff's Oxycodone use and he was started on Dexadrine over two years after

22  his initial evaluation because he continued to suffer from cognitive issues,

23  concentration and memory challenges.  Dr. Zimmerman concluded that the purpose

24  of the mental status examinations were mainly for the purposes of assessing

25  suicidality, psychosis and other acute changes due to medications and do not mean

26  Plaintiff is not suffering from cognitive changes and a comprehensive and detailed

27  mental status exam is outside the scope of his medication management visits.

28

Case No.:



98.    Plaintiff appealed Unum's decision to terminate his disability benefits by letter dated August 30, 2016.  In his letter, Plaintiff explained that he is incapable of working full-time or part-time, even in a sedentary occupation, because of the severe pain caused by his post-laminectomy syndrome and chronic pain syndrome, the side-effects from his pain medications, and his Attention Deficit Disorder, Major Depression, and General Anxiety Disorder in addition to his decreased energy, lack of sleep due to pain, and motivation and memory difficulties.  Plaintiff also noted that Unum relied upon deficient opinions offered by its peer review physicians who denied the severity of his symptoms, it required heightened standards to qualify for disability benefits that are not contained in the Policy, and it also failed to consider Plaintiff's non-exertional limitations including his medication side-effects, psychological limitations, and his inability to remain seated for an extended period of time.

99.    Plaintiff submitted an additional letter to Unum dated October 28, 2016, to address the unsupported conclusions reached by the Administrative Law Judge which were relied upon by Dr. Zimmerman in her review and Unum in terminating Plaintiff's disability benefits.  In the letter, it was noted that Judge Bennet actually supported Plaintiff's disability.  Judge Bennett determined that Plaintiff's degenerative disc disease of the cervical and lumbar spine and other abnormal degenerative changes, including multilevel disk space narrowing in the lower thoracic spine and anterior wedging of the T11 vertebral body and a 12mm left adrenal nodule, "singly and in combination, more than minimally affected claimant's ability to perform basic work activities."  Judge Bennett went on to state that the "impairments were, thus, 'severe' for Social Security purposes."  The letter also noted that criteria for a determination whether an individual is "disabled" according to the Social Security regulations and according to the Policy are drastically different.

Case No.:



100.   The October 28, 2016 letter also noted that not only did the decision rendered by Judge Bennett on August 1, 2013 fail to contain an examination of Plaintiff's records after that date, but it also detailed the significant bias exhibited by Judge Bennett in his opinion.  For example, Judge Bennett demanded objective evidence of Plaintiff's subjective complaints and he improperly rejected the opinion of Plaintiff's psychiatrist due to his proper reliance upon Plaintiff's subjective complaints.  The letter further noted that Judge Bennett improperly questioned Plaintiff's credibility based upon what he believed were inconsistencies in Plaintiff's reported activities and his inability to work in a sedentary occupation, but Judge Bennett did not appear to be aware of the purpose for Plaintiff's travel to California for medical treatment and Mexico to visit family as he insinuated that Plaintiff was traveling for vacation.

101.   On January 27, 2017, Dr. Jonathan McAllister, a physician hired by Unum, conducted a cursory review of Plaintiff's medical records and determined that Plaintiff's "recent records do not reflect ongoing or consistent treatment with orthopedic spine surgery, neurosurgery, physiatry or neurology."  Dr. McAllister also determined that the available medical records do not consistently document medication side-effects and he also noted that Plaintiff did not have his driving privileges suspended.  Dr. McAllister concluded that "the available medical records do not reflect the claimant's inability to full time work [sic] with reasonable continuity within the occupational demands."  Despite the fact that it was noted in Unum's request for Dr. McAllister to review Plaintiff's records that Plaintiff claimed Unum failed to consider his diagnosis of post-laminectomy syndrome, Dr. McAllister failed to address this diagnosis in his analysis, instead focusing his efforts on listing the types of doctors that Plaintiff did not treat with.

102.    Dr. McAllister's ignorance of Plaintiff's diagnosis of post-laminectomy syndrome is revealed in his statement that Plaintiff's recent records reflect less intense treatment and evaluation than Plaintiff was receiving from 2009 through 2011.  As mentioned, Plaintiff underwent an invasive and significant surgical procedure in 2009, which required a significant period of recovery and therapy and even after Plaintiff attempted to return to work in 2011 he was eventually forced to stop due to his pain and medication side-effects.  After follow-up treatments with his spinal and neurological doctors, it was determined that his surgery was a success despite his continued pain, and Plaintiff was subsequently diagnosed with post-laminectomy syndrome and the treatment prescribed for this diagnosis was simply continued pain management.  Dr. McAllister fails to specify any alternative treatment for Plaintiff's post-laminectomy syndrome that would have been more beneficial or medically acceptable, and he failed to address the conclusion of Unum's other consulting physician, Dr. Williamson, who determined that the available medical records supported Plaintiff's restrictions and limitations provided by Dr. Chavez, and they were likely permanent.

103.    Dr. McAllister also downplayed Plaintiff's consistent reports of experiencing medication side-effects, Plaintiff's slurred speech documented by Unum's investigators and employees, and even ignored the fact side-effects such as fatigue, slurred speech, and difficulty concentrating are common with the types of strong pain medications Plaintiff was taking, all in order to determine that Plaintiff was not disabled.  Dr. McAllister's brief and cursory review was biased in favor of a finding that Plaintiff was not disabled which is indicative of his significant bias in favor of Unum.

104.    On February 7, 2017, Dr. Peter Brown, a psychiatrist hired by Unum to conduct a review of Plaintiff's medical records, determined that general medical

1  restrictions and limitations were not supported and there was no evidence for

2  cognitive side-effects due to the related medication regime.  Dr. Brown stated that

3  no significant cognitive complaints were made and his mental status examinations

4  were normal.  Dr. Brown failed to address Dr. Darmal's letter dated August 20,

5  2016 where he explained that mental status exams are mainly for the purpose of

6  assessing suicidality, psychosis and other acute changes due to medications and it

7  does not mean the patient is not suffering from cognitive changes and his visits were

8  not for the purpose of a neurocognitive assessment.  Dr. Brown's review appears to

9  have been extremely cursory and selective as he failed to address the fact that

10  Plaintiff reported experiencing depressed mood, anxiety, sadness, hopelessness,

11  decreased interest, low energy, and sleep difficulties, and Plaintiff's performance on

12  Connor's CPT was poor indicating inattentiveness.

13

14      105.   On February 23, 2017, Dr. Betts responded to an inquiry from Unum.

15  Dr. Betts stated that Plaintiff is **not** able to perform full time work involving:

16  exerting up to 20 pounds frequently, occasionally walking, standing, reaching in any

17  direction, handling, fingering, frequently sitting and keyboarding allowing for a

18  brief change in positions and posture during performance; and whether he had the

19  mental/cognitive abilities of understanding and memory, sustained concentration

20  and persistence, and adaption to change and independent planning.  Dr. Betts further

21  stated that "Mr. Heinaman is unable to carry out prolonged physical or mental tasks

22  due to his cervical pain from post-laminectomy syndrome.

23

24      106.   By letter dated February 28, 2017 Unum upheld its termination of

25  Plaintiff's disability benefits claiming that Plaintiff no longer meets the definition of

26  disability based largely upon the opinions of its reviewers.  Unum noted that its

27  vocational department determined that Plaintiff's occupation requires sustained

28  concentration and persistence, peer and public interaction, adaption to change and

Case No.:



1   independent planning, but then claimed that Plaintiff does not have cognitive

2   impairments and he is not precluded from performing the duties of his occupation

3   from a mental standpoint.  Unum claimed that Plaintiff's medical records do not

4   support he was disabled from performing his occupation as of May 20, 2016, when

5   his claim closed and benefits ended.

6

7       107.   Unum relied heavily upon the opinion of its reviewing

8   neuropsychiatrist who ignored the side effects Plaintiff experiences and concluded

9   that the available records as of April 2016 did not support cognitive deficits or

10  restrictions and limitations due to any behavioral health condition.  The

11  neuropsychologist clearly ignores the numerous reports from Dr. Darmal, the reports

12  from its own investigators noting Plaintiff's slurred speech, Plaintiff's consistent

13  reports to Unum employees of mental and cognitive impairments, and the letter

14  from Dr. Betts explaining that the high dose oral medication Plaintiff is required to

15  take include common significant debilitating side-effects that prevent Plaintiff from

16  performing his occupation.

17

18      108.   In order to downplay Plaintiff's subjective complaints that prevent him

19  from being able to perform the duties required by his occupation, Unum not only

20  ignores documented cognitive complaints in Plaintiff's medical records, but it also

21  improperly claims that Plaintiff demonstrated credibility issues that were recognized

22  by the Social Security Administrative Law Judge, claiming that the judge noted

23  concerns regarding the reliability of Plaintiff's statements as to the extent of his

24  symptoms and level of dysfunction, as well as his involvement with HCG.  Unum

25  failed to consider any of the flaws with Judge Bennett's analysis addressed in

26  Plaintiff's October 28, 2016 letter.

27

28

109.   Unum's denial letter noted that the physical demands of Plaintiff's occupation included exerting up to 20 pounds of force, occasional walking, standing, reaching in any direction, handling and fingering, and frequent sitting and keyboarding.  Unum also noted that it does not have any medical disagreement with any provider who treated Plaintiff for his physical diagnoses, however Unum then claimed that Plaintiff was not precluded from performing the substantial and material acts of his usual occupation due to physical conditions of back pain. Despite the fact that Plaintiff's disability is chronic and will most likely continue for an indefinite period, a fact recognized by Unum's own consulting physician, Unum determined that Plaintiff is no longer disabled.  Unum never acknowledged Plaintiff's diagnosis of post-laminectomy syndrome, which involves chronic debilitating pain despite a successful spinal surgery, and instead attempted to improperly downplay Plaintiff's disability by noting that Plaintiff's records do not reflect ongoing or consistent treatment with an orthopedic spine specialist, neurosurgeon, psyatrist or neurologist "as would be expected for a spine condition." Unum completely misses the mark regarding Plaintiff's diagnosis of post-laminectomy syndrome.

110.   Unum purposefully ignored the content of Dr. Betts August 24, 2016 letter explaining why Plaintiff is disabled and describing in detail, his diagnoses and the symptoms that prevent Plaintiff from being able to work.  Instead, Unum used Dr. Betts' initial unwillingness to comment on Plaintiff's disability status as a justification for terminating Plaintiff's disability benefits, despite the fact that Plaintiff's available medical records overwhelmingly support that he is incapable of working.

111.   Unum also claimed that Plaintiff's travel to Las Vegas and his travel to Mexico to visit family is inconsistent with his reports of medication side-effects and

-35-

1   cognitive impairment, since these trips indicate he can sit for extended periods.

2   While Unum recognized that Plaintiff indicated his wife would share in the driving,

3   it lacked any knowledge regarding the amount of rest breaks and adjustments

4   Plaintiff would make throughout the trip or the pain this travel would cause Plaintiff

5   for days afterward.  Additionally, Plaintiff's doctors did not prohibit him from

6   operating a motor vehicle when his condition would allow.  Plaintiff's ability to

7   briefly operate a motor vehicle or travel is in no way indicative of his ability to fulfil

8   his obligations as Vice President of HCG on a fulltime basis.

9

10      112.   Unum neglected to describe specifically what functional impairments

11  would establish Plaintiff's entitlement to benefits.  Moreover, the denial letter failed

12  to specifically identify for Plaintiff what additional evidence was necessary to

13  support his ongoing claim for LTD benefits.  Unum's failure to explain what

14  additional information was needed to support Plaintiff's claim for benefits was a

15  wrongful failure to engage with Plaintiff in a "meaningful dialogue."  *Salomaa v.*

16  *Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011) (holding where the

17  administrator issues a denial based on absence of medical evidence, the

18  administrator is obligated to state in plain language what additional evidence it

19  needed to satisfy the "meaningful dialogue" requirement).  Here, Unum denied

20  Plaintiff's claim in its final letter in part because "the information in your claim file

21  indicates that [Plaintiff is] not precluded from performing the substantial and

22  material acts of your usual occupation on a full-time basis from a physical or

23  psychiatric standpoint."  As mentioned, Plaintiff's medical records do demonstrate

24  his inability to perform the substantial and material acts of his usual occupation, and

25  Unum failed to explain exactly what sort of additional demonstrations were required

26  outside of what Plaintiff had already provided.

27

28

Case No.:



113.   Unum's decision to deny Plaintiff's claim after approving him for STD and LTD benefits and continuing to pay him benefits for over 6.5 years was improper because Unum's denial letters failed to identify "substantial evidence" of an improvement in Plaintiff's condition, which is required if an administrator initially approves a claim for benefits.  Applicable case law requires that substantial evidence must support a plan fiduciary's decision to terminate benefits in light of its initial finding of disability.  *See Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled.  In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration"); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [the administrator's] decision that a change of circumstances warranted termination of the benefits it initially granted.").[1]

114.   Plaintiff consistently reported experiencing severe debilitating pain in his back and neck, stiffness, disabling medication side-effects, an inability to focus

---

[1] In *Nolan v. Heald College*, 745 F. Supp. 2d 916, 936 (N.D. Cal. 2010), the district court rejected MetLife's argument that it "was entitled to terminate benefits despite no change in Nolan's condition."  Instead, the court explained that because the administrator failed to point to any "evidence suggesting that Nolan's condition had improved since it began paying benefits two years before.  Under *Saffon*, this 'suggests that she was already disabled,' and makes a reversal of MetLife's determination appropriate."  *Id.*  Similarly, in *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002), the Eighth Circuit noted that at the time of the denial decision, "Paul Revere had been paying benefits for some time, which suggests to us that Mr. McOsker was still totally disabled within the meaning of the relevant policy."  Given this, the court explained that "[w]e are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."  *Id.* at 589; *see also Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880, at *21 (D.N.H. 2012) (ruling it was improper for an administrator to determine that the claimant "was not disabled based on the same medical records that they deemed sufficient to support her disability" and the termination was not supported by "substantial evidence"

and concentrate, an inability to multi-task, an inability to sit or stand for extended periods, stress, anxiety, and he explained that these symptoms significantly restrict and limit his ability to perform activities of daily living.  Unum's disregard of Plaintiff's self-reported complaints without explanation and its attempt to demand clinical or objective evidence where no such evidence exists, or was overlooked by Unum, is improper.  In *Hagerty v. American Airlines Long Term Disability Plan*, 2010 U.S. Dist. LEXIS 91995 (N.D. Cal. Sept. 3, 2010), the court noted that "[n]umerous courts found it [in] error to require objective medical evidence of complaints that are inherently subjective in nature." *Id*. at *6 (citing Montour, supra at 635 ("unreasonable for Hartford to require Montour to produce objective proof of his pain level")); *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 21 (1st Cir. 2003) (requiring objective documentation of Chronic Fatigue Syndrome is unreasonable); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir. 1997) (same).  Indeed, an ERISA plaintiff is entitled to rely on credible subjective evidence in support of his claim.  *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 2014 U.S. Dist. LEXIS 9847, 2014 WL 294641 (N.D. Cal. Jan. 27, 2017).  Unum failed to explain why Plaintiff's self-reported complaints, which are consistently documented by several treating physicians and therapists, are insufficient to establish his disability, and alternatively, what sort of clinical findings or diagnostic evidence would be sufficient to establish Plaintiff's disability.

115.  It was improper for Unum to favor its paper reviewers' analysis over those conducted by Plaintiff's treating physicians.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 155 L.Ed.2d 1034 (2003) ("Nor do we question the [Ninth Circuit] Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of not disabled in order to save their employers money and to preserve their own consulting arrangements.'"); *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016) (a district

Case No.:

court's review of an insurance company's benefits decision, when it is based upon the opinion of a medical consultant used often by the insurer, should be tempered by skepticism because of the financial incentive that the consultant has to pander to the insurer's interests); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1011 (9th Cir. 2004) (noting that a fact-finder could reasonably conclude that an expert has lost his independence when that expert has represented an insurance company on a continual basis); *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623, 634 (9th Cir. 2009)("how frequently [the insurance company] contracts with the file reviewers it employed in this case" is relevant to ascertaining conflict); *Nolan v. Heald College*, 551 F.3d 1148, 1152 & n.3 (9th Cir. 2009) (evidence that the outside medical reviewers "received substantial work and monies from MetLife in the three-to-four years preceding and including [the claimant's] benefits denial" could be a factor tempering abuse of discretion review).

116.   In 2005, Unum entered into a settlement agreement ("California Settlement Agreement") with the California Department of Insurance ("CDI"), in connection with a market conduct examination and investigation of Unum's disability claims handling practices.  The CDI had chosen not to join the 2004 multistate settlement agreements Unum entered into with state insurance regulators of 48 states upon conclusion of a multistate market conduct examination of Unum's disability claims handling practices that became effective on December 21, 2004.  In the California Settlement Agreement, Unum agreed to:

> Give significant weight to an attending physician's opinion, if the attending physician is properly licensed and the claimed medical condition falls within the attending physician's customary area of practice, unless the attending physician's opinion is not well supported by medically acceptable clinical or diagnostic standards and is

Case No.:



inconsistent with other substantial evidence in the record.  In order for an attending physician's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

117.    Unum violated the letter and spirit of the California Settlement Agreement when it favored the opinions of its paper reviewers over the opinions of Plaintiff's treating physicians and did not state the "specific reasons why the [attending physicians'] opinion[s] [are] not well supported by medically acceptable clinical or diagnostic standards and [are] inconsistent with other substantial evidence in the record."

118.    Unum's improper decision has caused major disruption of lifestyle to Plaintiff and his family, causing them to sell assets, including their home and relocating to live with relatives, and has caused emotional turmoil for entire family including their daughter who had a psychic breakdown after Plaintiff and his family lost their home.

119.    Unum's February 28, 2017 denial letter stated that Plaintiff has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

120.    The proper standard of review is de novo.  Unum does not have discretionary authority pursuant to California Insurance Code Section 10110.6, and it erred in denying Plaintiff's claim.  California Insurance Code Section 10110.6 states in the relevant part:

Case No.:



(a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

(b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.

(c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.

...

(g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

121.    This section, by its own terms, applies to any policy or agreement that provides "disability insurance coverage" to "any California resident" regardless of where it was offered, issued, delivered, or renewed.  Here, as there is no dispute that Plaintiff was at relevant times a California resident, this section applies to the Policy and Plan at issue so long as they were offered, issued, delivered, or renewed after the effective date of the statute, which is January 1, 2012, but before Plaintiff's claim accrued.  *See Gonda v. The Permanente Med. Grp., Inc.*, 2014 WL 186354, at *2 (N.D. Cal. Jan. 16, 2014).  No party disputes that Plaintiff's claim accrued no earlier than May 20, 2016, which is the date on which his claim for LTD benefits was first denied.  *See Grosz–Salomon v. Paul Revere Life Ins.*, 237 F.3d 1154 (9th Cir. 2001) (an ERISA cause of action based on a denial of ERISA benefits accrues at the time benefits are denied).

Case No.:

122.   Thus, the only issue is whether the policy was offered, issued, delivered, or renewed on or after January 1, 2012, but before the date of the first denial, February 28, 2017.  For the purposes of section 10110.6, a policy automatically renews every year on the policy's anniversary date.  *See* Cal. Ins. Code § 10110.6(b) (providing that "renewed" means "continued in force on or after the policy's anniversary date").  Here, the Policy became effective on May 1, 2007. This means the Policy's renewal date falls within the relevant time period, as the policy continued in force through January 1, 2012 and renewed annually.  *See Gonda, supra* at 1093-1094; *Polnicky v. Liberty Life Assur. Co. Of Boston*, 999 F. Supp. 2d 1144, 1148 (N.D. Cal. 2013) (applying de novo standard of review to ERISA claim for denial of benefits because "[t]he Policy was continued in force after its January 1, 2012 anniversary date, [so] any provision in the Policy attempting to confer discretionary authority to Liberty Life was rendered void and unenforceable").  As such, any grants of discretion that can be deemed to be a part of the Policy are void and unenforceable, and thus, the denial of benefits at issue must be reviewed de novo.

123.   In a de novo review, "the burden of proof is placed on the claimant" to establish entitlement to plan benefits.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Id.* at 1295-96.  The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits.  *Silver v. Executive Car Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  De novo review permits the trial court to "evaluate



1    the persuasiveness of conflicting testimony and decide which is more likely true."

2    *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.1999).

3

4        124.    Regardless of the standard of review this Court applies, Unum reached

5    an incorrect decision given the ample medical evidence in support of Plaintiff's

6    disability.  Unum's denial letters failed to address the overwhelming medical

7    evidence supporting Plaintiff's continued claim for LTD benefits, failed to engage in

8    a "meaningful dialogue" with Plaintiff regarding what additional medical evidence

9    was needed to support his claim, and improperly denied Plaintiff's claim asserting

10   that "[t]he records support he is able to perform his occupation."  Accordingly,

11   Unum conducted a biased claims investigation consistent with its inherent conflict

12   of interest that failed to provide Plaintiff with a full and fair review of his claim, in

13   violation of ERISA.

14

15       125.    Plaintiff is now, and at all times relevant remained, "disabled" as

16   defined in the Plan, and has now, and at all times relevant, convincingly

17   demonstrated his total disability through medical records and other documents,

18   information, and correspondence.

19

20   **FIRST CAUSE OF ACTION**

21   To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest

22   under ERISA Plan – 29 U.S.C. sections 1132(a)(1)(B), (g)(1)

23   (Plaintiff against UNUM and Does 1 through 10)

24

25       126.    Plaintiff incorporates the previous paragraphs as though fully set forth

26   herein.

27

28



127.   ERISA section 502(a)(1)(B), 29 U.S.C. section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

128.   At all relevant times, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for continued LTD benefits under the Plan, and by related acts and omissions, Unum violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.

129.   Unum has failed to follow even the most rudimentary claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. section 1133(2).  Thus, even if the Plan vests discretion in Unum to make benefit determinations, no deference is warranted with regard to Unum's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

130.   A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. §1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. section 1104(a)(1).  Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are



1   adverse to the interests of the Plan, its participants, or its beneficiaries.  Unum's

2   handling of Plaintiff's disability benefit claim falls far short of these standards.

3

4   131.   For all the reasons set forth above, the decision to deny disability

5   insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational,

6   contrary to the evidence, contrary to the terms of the Plan and contrary to law.

7   Unum abused its discretion in deciding to deny this claim as the evidence shows its

8   denial decision was arbitrary and capricious.  Further, Unum's denial decision and

9   actions heighten the level of skepticism with which a court views a conflicted

10  administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d

11  955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105

12  (2008).  Unum's denial of Plaintiff's claim constitutes an abuse of discretion as

13  evidenced by, but not limited to, the following conduct:

14

15      • Ignoring the opinions of Plaintiff's treating physicians who maintained

16          that Plaintiff is and was unable to return to work.  Deference should be

17          given to these physicians' opinions as there are no specific, legitimate

18          reasons for rejecting these physicians' opinions which are based on

19          substantial and objective evidence in the claim file;

20

21      • Applying an extra-Policy requirement that Plaintiff exhibit additional

22          symptoms, obtain additional treatment, or suffer from additional

23          restrictions and limitations, solely to deny Plaintiff disability benefits.

24          Such additional medical evidence, restrictions and limitations, and

25          mandatory additional symptoms are not required under the Plan, and

26          thus cannot be the basis on which to reject a claim.  In the alternative,

27          Unum ignored Plaintiff's objective proof of disability;

28

-45-



- Refusing to examine Plaintiff, instead relying on a "paper review" conducted by its obviously biased physician reviewers, who issued opinions contrary to Plaintiff's treating physicians, and who ignored their statements regarding Plaintiff's disability, and insisted that more evidence of Plaintiff's inherently subjective severe chronic pain was needed, and insisting that Plaintiff's restrictions and limitations resulting from his severe and chronic pain were not supported because he did not exhibit other potential symptoms that may result from these disabling conditions.  The paper reviewer downplayed the findings of Plaintiff's treating physicians regarding his functional limitations, and completely ignored Dr. Betts' certification of Plaintiff's disability, so as to reach a finding that he was not disabled; and the paper reviewer's conclusions were cursory and conclusory in nature with no analysis of the medical records or the contrary opinions of Plaintiff's treating physicians;

- Making no effort to inquire whether Plaintiff faced a realistic or appreciable risk of disability and/or future harm if he resumed full time work;

- Failing to make a "full and fair" assessment of claims and to clearly communicate to Plaintiff the "specific reasons" for his benefit denials;

- Not engaging in "meaningful dialogue" with Plaintiff.  Unum was obligated to, but failed to, state in plain language what additional evidence it needed and what questions it needed answered so that Plaintiff could provide the additional material and information; and

Case No.:



- Failing to comply with ERISA's procedural requirements providing a full and fair review.

132.   As a direct and proximate result of Unum's denial of disability benefits, Plaintiff has been deprived of LTD benefits from and after May 21, 2016.

133.   As a direct and proximate result of the denial of his claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action, and is entitled to reimbursement of these fees pursuant to 29 U.S.C. section 1132(g)(1).

134.   A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks the declaration of this Court that he meets the Plan definition of disability, and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim consistent with the terms of the Plan.

135.  Plaintiff alleges all of the same conduct against Does 1 through 10 as it does against Unum in this First Cause of Action and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.   For all Plan benefits due and owing Plaintiff, including LTD benefits;

Case No.: 

2.   For costs and reasonable attorneys' fees pursuant to 29 U.S.C. section 1132(g);

3.   For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code section 10111.2; and

4.   For such other and further relief as this Court deems just and proper.

Dated:  May 8, 2017                    MCKENNON LAW GROUP PC


                                                      By:  _____
                                                           ROBERT J. McKENNON
                                                           DAVID S. RANKIN
                                                           Attorneys for Plaintiff Mark Heinaman
                                                           Attorneys for Plaintiff Mark Heinaman

Case No.:

